Haynes, J.
The case of Milton Laylin, who sues for himself and others, against Alexander Lewis, George Simmons and John T. Townsend, as County Commissioners of Huron county, Ohio, Henry W. Owen, as County Auditor, John C. Sheffield, as ■County Treasurer, and Luther B. Mesnard, as County Surveyor of said Huron county, Rody Ryan and Orrin B. Hawes, comes into this court by appeal, and is an action that is prosecuted by the plaintiffs, or on their behalf, to enjoin the collection of certain assessments that have been made against the property of the petitioners-for the purpose of constructing an improvement upon a certain street and road in the city and county under the two-mile assessment law for pikes.
The defendants Ryan and Hawes hav¿ filed a demurrer to the petition. The demurrer is a géneral one. We are of the opinion, without discussing the matter, that the petition as to them should be dismissed. We can see no reason why they were made parties to the suit. They have no interest in the assessment in the present condition of affairs, and are not interested in the result of the suit.
It appears that about the 11th of August, 1884, a petition was presented to the commissioners of Huron county, signed by the requisite number of land-owners, praying for the improvement of a road from .Medina street, in the city of Nor-walk, and extending eastwardly upon what is known as the Berlin & Cleveland road, to a point in East Norwalk, upon a certain road leading to Milan.
Upon the petition being filed, a bond-was entered into by Orrin M. Hawes, who was one of the petitioners, conditioned *340 for the payment of the costs in case the petition should be refused ; and it is objected, in the first place, that this bond) was signed only by Hawes himself. The statute requires that a bond shall be given, signed by a freeholder,, and that all the other petitioners shall share pro rato with. himi in any costs and expenses that he may be subjected, to. by. reason of the-bond. We think that bond was properly signed by Orrin Ml Hawes; that a bond signed by him alone was sufficient, he having the other requisite qualifications, as is admitted or found.
Upon that being done, an order was entered by the county commissioners appointing three viewers, under the statute,, together with an engineer, to- make a- proper survey of the road, and to make a report of the lands that would be benefited and ought to be assessed for the making'of' the improvement. Under the statute, notice was given to these persons to meet on the 3rd of September.. The recitation in the Journal is that the commissioners directed that the meeting be held at that time. It was objected'that the auditor alone made that order. But we find sufficient in the record to-show that it was made by the county commissioners. Dhe notice was given in the proper papers of the day of meeting, and at the-appointed time the viewers met and proceeded along the line of the road, and made a return to the county commissioners, 1 think, on or about the 13'th of September; and in that they stated the points to which the road should go, and gave a-profile of the work that was proper to be done, so-far as could be shown by a profile. They also returned a list of the names-of persons owning property within two miles of the proposed improvement, who, they said, were benefited by the wqrk,. and whose lands ought to be assessed' for the payment thereof.
On the 13th of September, that report being received by the-county commissioners, they continued the hearing thereof until the 20th day of September, for the purpose of allowing the presentation of a petition signed by the proper persons which-the statute requires shall be filed with; them’ before thejr cam the viewers meet. In .the order of business it is provided, in-section 4831, for the appointment of' these viewers, and the- *341 order the work to be done. On the 20th of September, a petition having been filed with them purporting to contain the names of a majority of those whose lands were included in the return of the viewers, they proceeded to act upon that report.
It is claimed that the commissioners had no authority ¡at this time to make any order whatever, because the original order was made at a special session of the commissioners, which was held on the 11th day of August. We are of opinion, under the statutes that have been quoted here, that the county commissioners had authority at this special meeting to make this order, and that there was no error in "their proceedings in that respeet.
On the 20th of September, as I have said, they proceeded to make an order on the report that had been returned, and it is said that this -viewers’ report could not be received by the county commissioners at that session; that it should have been made at the next regular session, which should have been held after the time when the viewers were ordered to meet, and they having been ordered to meet on the 3d,of September, which fell within the time of the regular September session, therefore no report should be made until the December session following, a period of about three months thereafter.
The statute is not as clear upon that question as it might' be, and arguments can be made in favor of the different positions that are taken by counsel in the case, it being claimed on the one side that they are to make report at the next regular session after the date on which the appointment is made by the commissioners, on the other that it should be made at the next regular session, as I have stated, after the time when next section provides for the notification of the viewers and the publication of notice when they are to meet, and section 4833 provides that they shall meet at the time and place specified by the commissioners, and after taking an 1 oath of office, ’ shall take to their assistance two suitable persons as •chain-carriers, and one marker, and proceed to view, examine, lay out or straighten such road as, in their opinion, public utility and convenience require, and assess and determine the damages sustained by any person through whose premises the *342 road is proposed to be laid out, straightened or improved.” It is sufficient to say, in regard to the damages here, that no claims for damages were made.
Section 4835 then provides that “ the viewers and survey- or or engineer, shall make a report to the commissioners at their next regular session, showing the public necessity of the contemplated improvement, the damages claimed, and by whom, the amount assessed to each claimant, an estimate of the expense of the improvement, and the lots and lands which will be benefited thereby and ought to be assessed for the expense of the same.”
We are of the opinion, on a careful examination of the statutes, that it was proper for the viewers to make their report, and for the commissioners to receive it, at the September session, and that there was no error on the part of the commissioners in receiving the assessment at that time.
The next step in the order of business was, as I have said, the filing of the petition, and the examination of that by the commissioners to ascertain whether the requisite majority had signed' it; for the statute, section 4836, provides that the “order shall not be made until a majority of the resident landholders of the county, whose lands are reported as benefited, and ought to be assessed, .subscribe the petition mentioned in section forty-eight hundred and thirty-one.”
It is objected that the county commissioners erred in finding that there had been a majority of the proper landholders who had signed the petition. This is a question that lies at the basis of the jurisdiction of the commissioners to act in regard to’the work; for it is provided that if the requisite number have not signed, the paper shall be'filed away for future use, and no further steps shall be taken.
The presumption in this class of cases is in favor of the finding of the commissioners. Whether you view them as a court of limited jurisdiction, or simply as a body acting under and by virtue of the statute in performance of a duty which falls upon them in the exercise of a part of the political power in the government of the county, in either event the presumption is in favor of the validity of their proceedings; and the burden of proof to show that the requi *343 site number did not sign is upon those who challenge the-validity of their proceedings. Quite a large amount of evidence has been taken in regard to this matter, to which the-court has listened, extending through a period of some days.-
There is one class which may be dealt with here by itself,, and that is petitioners who, it is said, ought not to be counted-because one of the promoters of this road, to-wit, "Orrin M.. Hawes, and some others who aided him in the matter at the time that he obtained the signatures of these landowners, obtained them under and by virtue of certain misrepresentations that were made by him to them, and upon which it-is averred that they acted, and without which they would, not have signed the petition.
It will be noticed that in the order of business this road is3 started originally h}3 certain parties, land-owners, signing a petition praying for the order of improvement by the commissioners. It will be seen, also, by the statute, that after the order is made and the contract is let, then bonds are issued by the county commissioners upon the credit of the county, upon which the money is raised for the purpose of paying the contractors for the work that is done. These bonds are the. bonds of the county.
The commissioners, at the time they receive this petition,, count these signatures; and it is sufficient to say, -as to those-who claim that they signed by reason of the misrepresentations, that their signatures are attached' to those petitions,., and that their signatures are genuine. The question whether they should be permitted to setup these misrepresentations: as against the county commissioners is one that we have considered, and we are of this opinion: That so long as the county commissioners acted upon these signatures, believing them, to be genuine, and having no knowledge (and when 1 speak; of knowledge I mean actual knowledge) of the fact of these misrepresentations, those parties should not be allowed to come-in afterwards and say, as between' themselves and the county,, whose officers, upon the faith and credit of those signatures,, have made these orders and issued the bonds of the county, that their names ought not to be counted. And it is sufficient to say, in this regard, that up to the time; the;order, was made, *344 no adequate notice of this claim had been given to the county commissioners. Whatever notice may have been brought to them after that time, or before the final contract was made, in our judgment, would not avail against the validity of their proceedings.
In a case that went up from the city of Columbus, being one of a very large number of cases that arose out of the improvement of North High street, in that city, and of which I shall speak hereafter, it was alleged by one of the parties that a certain person had signed a remonstrance to the work, and the supreme court say, in regard to that, the case.is distinguished from Hays v. Jones, 27 Ohio St. 218. In that case one of the land-owners, who, with others, had petitioned for the improvement, signed a remonstrance before the petition had been acted upon by the commissioners of the county;, and this the court held he could do, — not that he could do so after the order for the improvement had been made ; plainly inferring, so far as that decision is concerned, that inasmuch as this is a jurisdictional question, any remonstrance made or information carried to the commissioners after that time, would not affect the validity of their order, which was made upon the faith of the genuineness of these signatures.
In regard to the rest of the signatures, it is competent, as has-'been held by the supreme court, for the plaintiffs to show that any number of these petitioners did not, in fact, ■sign the petition, or that, if they assumed to sign it for any persons, they had no authority to do so — in other words, that they in fact did not sign the petition; and testimony has been ■offered in regard to a certain class of persons whose names are .affixed to the petition. We have examined very carefully the list of the names; we have examined the amount and number ■of those that are claimed to have been originally in favor of ■the road, of those who signed the remonstrances, and of those who, it is said, did „not properly sign; and we areunable to say, from the best information that we can obtain from the evidence, that there was not, at that time, to-wit, on .■this thirteenth or twentieth day of September, 1884, a majority of proper persons signing that petition. In other words, *345 we are unable to say that there was any error in the finding of the commissioners in regard to that fact. That would give the commissioners jurisdiction of the work, so far as that department of their duties is concerned.
At this point the duties of the commissioners, the various steps in the order of business in the prosecution of the work, ■diverge. The contract is to be let by the engineer and approved by the commissioners; and, keeping step with that, the commissioners are authorized to issue bonds and pledge the faith of the county to raise money for the purpose of paying for the improvement, and they are also authorized and required to appoint a committee, whose duty it shall be to apportion the estimated expense of the work upon the proper lands. Now, in regard to that matter. The commissioners did proceed to appoint certain persons to apportion this expense, and it is said that that apportionment is irregular, or perhaps invalid, by reason of certain defects in the petition, which are pointed out by counsel in argument in the case, in regard to the method in which the order was made, and in which it was performed. That will lead us into an investigation of the duties of the commissioners in regard to this matter.
I have already stated that the viewers make their report, with an engineer. These viewers are one set of persons, not necessarily, and not in fact, in this case, the same persons appointed afterwards to apportion the estimated expense of the work. The engineer who acted with them, was in fact the same person, but not of necessity.
Section 4842 provides that “ the commissioners, when any such improvement is ordered, shall immediately appoint three disinterested freeholders of the county, who shall, upon actual view of the premises, apportion the estimated expense thereof upon the real property embraced in the order, according to the benefit to be derived therefrom, and report the same to the county auditor; and in making such apportionment they shall take into consideration previous assessments made upon such real property for the improvement of the road, and any benefit which will accrue to any land by reason of drainage resulting from the making of the improvement.”
Now, that refers to an order. That order is provided for in *346 section 4836, which reads as follows: “ When the report is= filed, the commissioners shall, if in their opinion public utility requires it, enter on their records an order that the improvement be made, which order shall state the kind of improvement, the width and extent of the same, and the lands-which shall be assessed for the expense thereof.”
The order that was made at that time did dot state any lands by name. That is to say, no list of lands was embraced-in the order of the county commissioners or entered upon their journal, which should be assessed for the expense of the work. It is said that this i3-a fatal objection to the order for the apportionment. On the other hand, it is claimed on behalf of the defendants, the county commissioners, that the viewers’ report is the report upon which they are to act, and-it is claimed by one of the counsel on behalf of the defendants, perhaps by both, that the order in regard to that is set out with sufficient distinctness in the order that was made by the county commissioners; and that leads us to an examination of the orders that were made b3r the county commissioners.
It should be remembered that it is provided that this order-“shall state the kind of improvement, the width and extent-of the same, and the lands which shall be assessed for the expense thereof.” The journal of the commissioners says in relation to this road (and the same is copied into the final record) : “ The viewers and surveyor heretofore appointed by this board having filed their report, specifications, etc., showing, 1st, that the public necessity exists for said improvement, also a list of the lots and lands benefited and ought to be assessed; 3d, that no claims for compensation or damages have been filed with said committee, and that they have estimated the cost and expense of said improvement at about $8,000 per mile, or that the 2.92 miles (which was the length of the road) will cost $23,300.” It is marked in pencil here at the top of the report; so I suppose that is for the final record: “ Said report having been publicly read and carefully considered, and the board being fully advised in the premises, and being satisfied that public utility requires said improvement (here they find the utility), and to enable the board to know *347 the number of resident landholders who were signers of the-petition, on motion of Mr. Townsend, it was ordered that said matter be postponed for one week, and the board adjourned, to meet next Saturday, at 2 o’clock P. M.”
“ Pursuant to adjournment the board of commissioners in. and for the county of Huron, state of Ohio, met this 20th day of September, 1884. Present: Alexander Lewis, George Simmons, Mr. Lewis in the chair. Whereupon the consideration of the report of the viewers in the matter of the Hawes two-mile assessment pike was resumed, and the board being satisfied that more than a majority of the resident landholders of the county, whose lands are reported benefited, and ought to be assessed, had signed the petition. ” Now they have found two facts, the fact of the utility of the improvement, and the fact, that a majority of the resident landholders of the county had. signed the petition. “ The board being satisfied that more than a majority of the resident landholders of the county whose lands are reported benefited, and ought to be assessed, had signed the petition, on motion of Mr. Simmons it was ordered that said improvement be made in accordance with the report of the viewers and surveyor.” It should be noted there-that the improvement is ordered to be made. Nothing is said about the assessment of the expense of the work, nor about the lands to be covered by the assessment.
Section 850 of the Revised Statutes provides that the commissioners shall make a record of all the proceedings, which record is to be signed by the president of the board and by the-clerk of the board, and is to be received in all courts of the state as evidence of the action of the commissioners. This record I now hold. It is, indeed, not the ordinary full record, but it is a record of this road, and is a proper record in ivhich to enter these proceedings. It may be treated as a part-of the full record. This, from the point to which I have already read, has this in addition :
“ That said road be laid out and graded of the width of not less than twenty-four feet, and gravelled with lime or flint gravel from at or near Bellefontaine,.Ohio, or gravel of lime quality, of the width of sixteen feet, and of the length of two and ninety-two one-hundredths miles, between Medina street,. *348 .in the city of Norwalk, Ohio, and East Norwalk, Ohio, in said .county, and that the cost be assessed on the lands benefited hereby and lying within two miles of said improvement in - accordance with the statutes.”
Now, there is no list of the lands given there which they claim ought to be assessed, but the order is to this apportioning committee that they have appointed to assess the expense on the lands benefited. The statute provides that they -shall name the lands which shall be assessed for the expense. The order of these commissioners to this apportioning committee, after describing the length of work and the points between which it is to be done, is: “ That you have been apfpointed as a committee to apportion the estimated expense thereof upon the real property embraced in the order afore-said. You will therefore proceed forthwith upon actual view • of the premises, to make out the said apportionment according to the benefit to be derived therefrom, and report the same tío the county auditor.”
The viewers in their report say that “ they have made, and upon actual view of the premises report the following list of lots and lands, with the respective sums assessed on each as follows: ” Then they give a list. It is said that this list which is attached to this is the list that was returned by the viewers ; «•but there is nothing that we can find by any broad construction of the orders that were made by the county commission- . ers which refers to the viewers’ list as the list upon which they are to act. It is only by comparison of this list with the : list that was returned by the viewers that it can be ascer-tained that the lands are identically the same.
The duty of this apportioning committee is not to return a list of the lands which, in their judgment, they deem benefited.
' The lands which shall be assessed, in our judgment, are to be set forth by the county commissioners. The county commissioners fix the taxing district. Then the duty of the apportioning committee, under the statute, is to apportion the •estimated expense thereof upon the real property embraced in the order according to the benefits to be derived therefrom. It is very important that it should be fully and clearly understood by these viewing commissioners what their duty is. *349 Their duty, as I have said already, is not to return a list of' lands, but to take a list alreadj’ made up and included in the order of the county commissioners,.and proceed to apportion upon those lands the assessment according to the statute. They sustain substantially the same relation that a board of ' equalization, for instance, does to a return that is made by assessors of the lands of a township or county. That return is taken by the board of equalization, and while they may not • increase the amount of the valuation that has been returned by the assessors, yet they may equalize, taking from one and placing upon another property. So these viewers were to take the list of lands that should be given them by the county commissioners, and proceed to ascertain the special benefit, which resulted to any piece of land, and to apportion the cost of this work upon the land in proportion to the actual special benefit to each particular piece. We have already found that no such list was given them. Again, there is nothing in this return to show that in performing this work the committee ■ made this report and this assessment according to the special benefits. For aught that appears here, they may have taken the whole amount of this 128,000, and found that the lands on the list they have reported were benefited and assessed the whole expense of the improvement upon those lands, even although the amount of that expense was in excess of the amount of benefits derived from the improvement..
The importance of this matter cannot be over-estimated.
It .is proper here, perhaps, that I should speak of the nature- and character of these assessments, and the powers and duties-of both the commissioners and these viewers in regard to them.. The supreme court of this state has spoken upon that question, and its language is in accordance with the language of the decisions of the leading courts of other states, of the Supreme Court of the United States, and, so far as I know, of all courts that have spoken upon the subject. In decisions that were made thirty years ago the supreme court distinguish between the ordinary taxes that we pay upon the county duplicate, and these assessments which are made for local and special, objects. The court hold that general taxes “are impositions - for the purpose of general revenue.” They are laid without. *350 reference to the benefits that are to be derived by the' individuals whose property is taxed. They are levied 'for the purpose of sustaining the executive, legislative -and judicial departments of the state, the public schools, •and the various general objects which come within the ¡legislative domain in' the government of the state. Of course, it is expected, under the constitution, that they will . be levied as nearly in proportion to the amount of property • owned as they can be. It is expected, as a matter of course, that the benefits that are derived from good government more • than compensate each citizen for the amount of taxes he pays; but they are not laid with reference to that. But as•sessinents, the courts hold, “are special and local impositions upon property in the immediate vicinity of an improvement 'for the public welfare, which are necessary to pay for the improvement, and are laid with reference to the special benefit which such property derives from the expenditure.”
I have read from the decision'of the supreme court of this -state in the ease of Reeves v. The Treasurer of Wood County, 8 Ohio St. 333, which was made, I think, somewhere in the neighborhood of 1857.
The nxatter came again before thq supreme court at a later date, in the case of Chamberlain v. The City of Cleveland et al., 34 Ohio St. 551, and the- court there say :
“ To enable a municipal corporation to pay for a local public improvement, it may, by assessment, take from an indi-; vidual whose lands are subject to assessment and specially 'benefited by the improvement, such a portion of the cost there- • of as is the equivalent, but not in excess, of the special benefits conferred thereby.”
They are speaking now of municipal corporations, which are governed by the same rule.
“The whole amount of the assessment must be apportioned amongst the several lots and parcels of land specially benefited, in the proportion that the special benefit to each lot or parcel bears to the whole special benefits conferred by the improvement.”
On page 561 they say:
“The right that gives to municipal corporations the privi *351 lege of resorting to this mode of taxation is not, lik'e the privilege of general taxation in the state, founded on necessity; on ■the contrary, the right of a municipal corporation to assess private property to pay for a local public improvement is. not founded on necessity, but on a principle of j ustice, by which the public may take from an individual whose lands, owing to their proximity to it, are specially benefited by the improvement, such a portion of the cost thereof as is the equivalent, but not in excess, of the special benefits conferred by the improvement; and this principle of justice, in itself, impliedly furnishes the measure of and limits the extent of the right.”
They say again :
“But when the property has paid the value of the special benefits so conferred, its owners stand in the same relation to any residue of the cost of the improvement remaining unpaid that other members of the public do, and all must bear the burden of paying such residue by general taxation. If a sum is exacted in any instance in excess of the value of the special benefits conferred, it is, as to such excess, in that instance, private property unjustly taken for public use without compensation to the owner.”
We have said that it was the duty of the commissioners to enter in their order the lands which were to be assessed. They were to make an assessing district. We are not alone, however, in our judgment in regard to that matter, because we think we find a warrant for that conclusion in a decision of the supreme court, which may be found in the 23rd Ohio State, at page 605. In that case the viewers had made a report of the lands, and after it came into the hands of the commissioners, and after they had made the final confirmation of the assessment, they undertook, at a period some two years after, to add additional lands to that assessment. Judge Stone, in delivering the opinion of the court, says :
“ In. the course of the proceedings under the act referred to, the commissioners are required to appoint two committees. The first is to examine and report, among other things, an estimate of the cost of the proposed improvement, and the lots or lands which will be benefited, and ought to be assessed to pay for the same. Such report being made and the other re *352 quirements of the statute being complied with, the commissioners are authorized, if in their opinion public utility requires it, to order the improvement to be made, ‘ which or'der,’ the act provides, ‘ shall state the kind of improvement to-be made, .... and the lands which shall be assessed to pay the expense of the same,’ the language being substantially the same as it is now in the Revised Statutes.
“ Such order being made, it thereupon becomes the duty of the commissioners to appoint the second committee. This committee is required, upon actual view of the premises, to apportion the estimated expense of the improvement ‘ upon the real property embraced in the order aforesaid,’ and that is the same language as is now in section 4842, ‘ and report the same to the county auditor.’ ”
Then, after speaking of the duty to give notice, so that all people may come in and examine that report, they say in regard to it:
“ The terms 1 such final order,’ as used in section 5 of the act,” referring to this same one I have already read, “ plainly refer to the order made by the commissioners, as previously provided in the same section, directing the improvement to-be made, designating the lands ordered to be assessed. After that order is made, it may, in a proper case, be changed by adding thereto other lands; but such addition must be made,, if at all, before final action is taken by the committee of apportionment ; for, by the express provisions of section 6, that committee is required, upon, actual view of the premises; to-apportion the expense of the improvement upon the lands embraced in the order. The commissioners are also authorized, as we have seen, to change the report of the committee of apportionment, but whether the same be changed or not, their action confirming the report is final, and exhausts the jurisdiction of the commissioners with respect to the assessment.” See, also, 29th Ohio St., at p. 522, Parker v. Burgett.
Now, we feel clear that when this report of the viewers was made it was the duty of the commissioners to find territory within the radius of the two miles limit, and state the lands within that radius which were subject to assessment, in their judgment, and place a list of such lands in the hands of the- *353 committee for apportionment according to the benefits; and it was proper that this should be done, for the reasons that arise from the decisions I have read in regard to the benefits; because, under these decisions, when the apportioning committee come to make their report, they are to make the assessment according to the special benefits accruing to the lands sought to be assessed, and not in excess of them. If the commissioners get their districts too small, or if the committee, in making their apportionment, find that the lands will not bear, under the rule, all that the work costs, then they assess upon that territory only so much as the lands will bear under that rule, and the residue of the amount of the expense can not be collected from these landholders, and must be paid by the county from some other fund. So that it behooves the-commissioners, in making their district, to make it large-enough, if the facts warrant it, so that at least all the lands-within a radius of two miles may be brought by this committee-upon the tax duplicate. There is nothing in this order to show that when this committee went out and made this apportionment they took this matter into consideration, because they were ordered to assess the expense upon the lands benefited, and,for aught that appears in this record, they have taken this $28,000 and found that the lands lying within that radius were benefited, and assessed the whole amount upon the lands re-turned by them, without finding that the amount of the benefits to those lands was equal to the sum of $28,000. In fact, it may have been much less. In the case in 34th Ohio State, objection was made that the city council of the city of Cleveland did not find that the amount which, they had ordered to be' assessed upon the property equalled the cost of the improvement, or exceeded it, and for that reason the assessment was set aside.
For these reasons, we are of the opinion that this order to the apportioning committee, and the action of the committee-under it, was illegal.
It is objected that the oath could not be administered to these viewers and to this apportioning committee by the auditor. We are of opinion that the oath was properly admin *354 istered by the auditor of the county, under the statutes of the state.
A question was made that the surveyor made the contract before he had given bond, which fact, I believe, is true. At least, he had taken some steps toward it. The contract, under the statute, is to be made by the engineer. The engineer is appointed by the commissioners, and the statute requires that he shall give bond. The commissioners required that a bond be given, but that bond was not filed and approved by the commissioners until about the time that the contract was let; perhaps on October 6th. We suppose that the engineer was not an officer de jure, by law, until he gave that bond. He was appointed and acted defacto. The contract, however, was not binding or obligatory upon the county until it was approved by the county commissioners, and if made by him prior to the time of giving bond, and afterwards approved by the commissioners, as it was in this case, we see no error in that course of proceeding that should invalidate the assessment on that account.
It is also stated that the viewers fraudulently omitted from , the report which they made, lands they ought to have included. There is no evidence upon that point, save that counsel say that from the map which is here presented, the court ought to conclude that the viewers had acted improperly in regard to making the assessments. We think that from that map we ought not to come to any such conclusion, even if we should differ in opinion from the viewers in regard to that. There ought to be an affirmative allegation of and proof tending to substantiate the alleged fraud. It is to be noticed that there was no1 evidence whatever offered that there were other lands which should have been included. The matter is simply left without evidence.
Another question has been made here, and it is a question of large importance, and one to which we have given a great deal of attention, listening with much interest to the able arguments of counsel upon that point, and examining the authorities cited by them, as well as discussing it, as we believe from all points — at least, all points of view in regard to it that occurred to us, and that is, whether or not the commis *355 sioners of the county had.authority to improve a portion of a public street of the city of Norwalk. The allegation in the petition, in brief, is that from Medina street to the city line part of this public improvement is located upon a public street of the city of Norwalk.
The allegation is not denied, and there is nothing in the evidence to show, in any way or form, anything different from the averment that is made in the petition; and we must hold, so far as the argument is concerned in this case, and so far as the case is concerned, that from Medina street to the city limits, the portion of the work that was done within that limit was done in a public street of the city of Norwalk. There is no evidence to show that it was ever a county road.
Now, I think it must be conceded — at any rate, we think it is true — that all the power which the county commissioners have in regard to making these improvements is the power that is conferred upon them by the statutes of the state of Ohio. To those statutes we must look for the grant of the authority which is to be exercised by them. Section 4829, the first section of the two-mile assessment act, provides that “ the county commissioners of any county shall have power, as hereinafter provided, to lay out and construct any new county road, or to improve any state, county or township road, or any part thereof, or any free turnpike road, or any part thereof not completed, by straightening or altering the same, and by grading, paving, gravelling, planking or macadamizing the same, and by draining the same in any direction required to make the most convenient and sufficient outlet; and for such purpose they may, upon further petition, when by them deemed expedient, vacate any state, county or township road, or any part thereof, or any free turnpike road, or any part thereof not completed, and may improve several roads, or free turnpike roads, ór parts thereof not completed, when the same may be united in one continuous road improvement.”
Now, this is the only grant of power that we find in express terms, and it will be perceived that the grant is to lay out and construct a country road, and to improve a state, county or township road, or any part thereof, or any free turnpike roa4, or any part thereof. There is no grant in any *356 form or by any terms for the improvement of any street within any municipal corporation; and by a “street” I mean a street of the' city. I will speak hereafter of county roads within the city limits. Of course, the making of roads, the government of cities, and the repair of streets in cities are matters that lie. within the domain originally of the legislature of the state. The legislature may authorize that work to be done under acts passed by itself, or may delegate the power to the authorities who exercise the governing powers of the various political divisions of the state. One of these political divisions is a county, and the persons who are authorized in the main to control its powers, are the county commissioners. ■Another political division, and a very large one, in the state of Ohio, is found in the cities of the state — the municipal corporations, including cities and villages, and to a certain extent, road districts, and it is competent for the legislature to grant powers to these corporations or divisions; and it is not contended, and we do not think it can be rightly contended, that they may not alter or change, withdraw from or add to the powers of these various bodies. The question for us to determine in regard to this matter is this: What has the legislature of the state provided? And when we find what it has provided, what powers it has granted and what powers it has withheld, it is our'duty so to declare. It provided, at the same time it passed this two-mile assessment act, a very full and comprehensive code for the government of the municipal corporations of the state, and, among other things, it provided in section 2640, that “ The councilj¡shall have the care, supervision and control of all public highways, streets, avenues, alleys, sidewalks, public grounds, and bridges, within the corporation, and shall cause the same to be kept open and in repair, and free from nuisance.” And it has provided a ven' comprehensive system for the improvement of streets, for the making of assessments for the improvement of those streets, and very fully and in detail not only granted power, but limited the power of municipal corporations in relation thereto. But the dominion, the custody of those streets, the repair and control of them, is given into the hands of the municipal corporations. And this carries with it some local *357 responsibilities; because, under the decisions of the ‘supreme court of this state, followed now for a great many years — so long, indeed, that the matter is fully understood by the legislative power of the state — a municipal corporation is liable for negligence in failing to keep streets in repair — in failing to perform this duty which .is imposed upon it/by this statute, while the county is not liable.
Now, no power having been granted to these commissioners to improve a street in a city, and the custody and control of these streets being given into the hands of the municipal corporations, with a very extended and full grant of powers in regard to improving those streets, grading, paving, draining and keeping them in repair, whence does the power come which it is claimed was exercised by the commissioners at this time —the power of authority to .improve this public street of the city of Norwalk ? It is claimed in argument that it comes by implication from certain of the statutes that have been passed in relation to the two-mile assessment. Section 4850 provides :
“ When any road to be improved under and by virtue of this chapter begins or terminates in a city or village, the corporate authorities thereof may,.upon the recommendation of the county commissioners, if they deem the same expedient, agree to pay in the bonds of such city or village, in the manj&er and proportions described in section forty-eight hundred and forty-six, in addition to any amount that may be assessed upon the real property within such corporation by virtue of the provisions of this chapter, an amount not exceeding one-fifth of the entire cost of the road; but the entire tax to be imposed for road purposes, by virtue of this section, shall not in any year exceed five mills on the dollar of the taxable property in the corporation.”
It is also provided in an amendment made to section 4831, that in locating an improvement of this class within the territorial limits of any village or town, the engineer shall be confined to the platted streets of such village or town.
Section 4836 provides that the commissioners shall, unless he report of the viewers shows that there is no public neces *358 sity for such contemplated improvement, “ enter on their records an order that the improvement be made, which order shall state the kind of improvement, the width, the extent of the same, and the lands which shall be assessed for the expenses thereof; but such order shall not be made until a majority of the resident landholders of the county, whose lands are reported as benefited, and ought to be assessed, subscribe the petition mentioned in section forty-eight hundred and thirty-one.”
Now, in regard to taxation, in passing, I may say that there is no question, under the decisions of the state, but that for public road improvements assessments may reach into a municipal corporation. Indeed, the lands lying within a municipal corporation are subject to taxation by different bodies. They are subject, of course, to taxes that are levied by the state authorities for state purposes, by county authorities for county purposes, as well as by municipal authorities for municipal purposes. So that within the limits of the city taxes are imposed by different bodies. But the question is whether or no these provisions permitting the corporate authorities to pay one-fifth of the cost of the road amount to a grant of power to the commissioners to improve a street of a city. In order to do that, it should appear that it must be applied exclusively to public streets, and that it may not be applicable to roads or highways within the limits of the city. And a question is raised as to whether or no the county may have public roads, county roads, within the limits of a corporation. Citation has been made of the 17th Ohio, and of some other authorities. Without discussing these cases, we may state, in conclusion, that we see no reason why the commissioners may not establish within the limits of a municipal corporation a county road. Especially we see no reason why they may not establish a county road for the purposes of this class of improvement. It will be noted that, under section 4829, “ The county commissioners of any county shall have power, as hereinafter provided, to lay out and construct any new county *359 road, or to improve any state, county or township road.” That is to say, they may lay out a county road for the purpose of improving it in the manner in. which it was proposed to improve this road; and we see no reason why they may not do that within the limits of a corporation. It must be remembered that these corporations in the state embrace a large variety, from the largest cities down to the smallest villages, or pei’haps road districts; and that it might be very appropriate, in certain cases, for them to go through a municipal corporation, as they did in that ease in the. 17th Ohio, where they went from the city limits to the Ohio river with a county road, in order to reach another large road leading from Wellsville to Cleveland, or that they might do, as they did in the village of Milan, lay out for public purpose's a county road wholly within the limits of the village. It will be noted that the limitation that is made to section 4831, applies only to villages and towns; it does not attempt to. reach cities, first, second or third class.
But the very fact that, in regard to one or two classes of cities or villages, these limitations are made to platted streets, would go in argument to shoAv that the county commissioners had power to establish roads in the cities, and if they have poAver to improve county roads already existing Avithin the city limits, or to establish roads within the same, and then so improve them, it Avould not, in our judgment, folloAV, that the sections quoted grant to the commissioners poAver to improve the streets of the city in the manner claimed. In our judgment, some clear and more explicit grant of power should be shown.
Now, as I said in the opening, Ave appreciate the importance of this question. It is a very important question, aside from its relation to the present parties,, and we have endeavored to give it very full investigation, to examine all the authorities. It impressed us upon the first statement of the case that the county commissioners had no authority to enter upon this street and make this improvement, and we have come out oí *360 the investigation fully confirmed, clearly confirmed in our own minds, in the view that the commissioners of this county had no right or authority, under the statutes of the state oí Ohio, to enter upon a public street of the city of Norwalk and order its improvement in the manner in which they did; and for that reason the assessments made for the work are invalid. Support for the views we have taken in this matter may be found in the cases of Commissioners v. Railway Co., 45 Ohio St, 401, 405—6; R. R. Co. v. Commissioners, 35 Ohio St., at p. 9.
There is another question in this case, and that is in regard .to the matter of estoppel. There are two or three classes of .persons here who it is said should be estopped. First, there are persons who signed the petition for this work, and have .stood by during the time that the work has been carried on,
,and have never protested in any manner or form against it. As to that class of persons, we hold that there is an estoppel. We hold it under the decisions made by the supreme court in fhe Tone cases. They invoked the action of the county commissioners in improving this street. Acting upon their invitation and at their request the commissioners have gone forward .and made this improvement, and they are receiving whatever benefits are to be received from it. To the extent of the benefits received by them from this work — special benefits over and above the general benefits — we hold that they ,are estopped.
There is another class oi persons, however, who petitioned for this work, who afterwards signed remonstrances against the work. These remonstrances, as I have already stated, were filed after the original order was made ; and while they .do not affect the validity of the original order, they are of effect in regard to the rights and liabilities of these parties under this assessment. Those remonstrances were :
“ 1st. That the road does not need gravelling, being of a .dry, sandy soil.
“ 2nd. That said gravelling, as proposed, is expensive, and *361 would be a heavy burden upon the property-owners to pay without selling|their farms.
“ 3rd. That a large number of the signatures to said petition were obtained by misrepresentations and incorrect state-ments.”
It is admitted, I may say in passing, that there was not a -majority of all those who were the proper persons to sign a paper requesting the stopping of that work -who signed -a paper of that kind — of the promoters — and that therefore •the commissioners were not required, under the section of the •statutes which authorized these persons to sign a paper of that •kind, to stop the work. The question whether after these papers were filed they should stop- or not, was a question that was left with the commissioners of the county. It is a question that was addressed to their judgment, to their acquaintance with the facts of the case, to their opinions in regard to •the proposed improvement, the amount of its cost, and the propriety of making that improvement. We are not only bound in law, but we are also bound in fact, upon the evidence in the 'case, to presume that they came to their conclusions, with regard to those remonstrances, from correct motives. Whatever is addressed to us in regard to that matter is addressed to us ■as a court of equity and, sitting as a court of equity, we have no right to say that they ought to have stopped work, unless ■their acts are placed under some of the well-known and well-■defined heads of chancery jurisdiction, one of which may be that they acted fraudulently. We have allowed a large amount ■of evidence to be taken, and we are bound to say that no fraud has been proved against them. It is admitted here that they ■are honorable, upright, and honest men. The most that can be said is, that they did not act with what the persons who ■challenge their action say would have been wisdom. Whether ■they did or not, it is not for us to pronounce. It is sufficient ■to say that there is nothing that authorizes us to interfere ' with their action in that regard. But as to this class of persons who signed the petition and came in afterwards and re *362 monstrated against the work, no matter upon what ground they placed that remonstrance, they will not be estopped from setting up any irregularity in the subsequent proceedings in this improvement of which they had no knowledge.
There is another class of persons who are referred to, and those are persons who did not sign the petition, but who stood by during the whole of the time that the work was going on without saying anything pro or con.
In regard to this class of persons of whom I am speaking, the court in the Tone cases, 39 Ohio St. 281, modified to a considerable exient the course of the holdings of the inferior courts in regard to the doctrine of estoppel, which they had been in the habit of basing upon the case of Kellogg v. Ely, 15 Ohio St. 64. The court say :
“Active participation in causing the improvement to be made will estop the party engaged therein from denying the validity of the assessment; but to create an estoppel from silence merely it must be shown that the owner had knowledge, 1. That the improvement was being made; 2. That it was intended to assess the cost thereof, or some part of it, upon his property; 3. That the infirmity or defect i'n the proceedings existed which he is to be estopped from asserting; 4. It must appear that some special benefit accrued to his property from such improvement which it is inequitable, under the circumstances, he should enjoy without compensation.”
Now, there is a large class of those persons. Many of them have been upon the stand. Under the decisions of the .supreme court, it is the duty of the defendants, who seek to set up this estoppel, to show that each person whom they seek to estop comes within the definition and within the rules that are laid down by the supreme court. They must have knowledge . of the defects; they must have knowledge that it was intended to charge their property with the cost of improvement; they must have knowledge that .they were to be benefited by it; and, without discussing the matter (for my time is getting short,) we hold in regard to this large class of persons that the proof has not been made out that it required to *363 be made out in regard to them — proof that they had the knowledge which would estop them. See also, 44 Ohio St., pp. 485-6.
G. T. Stewart and J H. Doyle, for plaintiff.
L. G. Laylin and G. E. Pennewell, for defendants, the county-officers.
Jay Patrick, for Ryan & Hawes.
The petitioner, Milton Laylin, so far as he is concerned, does not come within any ground of estoppel; was not an original signer of the petition, and as to him the petition should be sustained.
There is a class of persons who signed and remonstrated after costs had been made to the amount' of two or three hundred dollars. As to that class of persons, that amount of costs would be properly assessed against their property. It is not a large amount, but it will require some work in order to ascertain what it is.
There is another class of persons who, under the rule that, we have laid down, will not be estopped at all, and as to them the petition will be sustained.
In regard to the decree in this case, it is very evident there must be a good deal of detail work done, and it may be necessary, perhaps, to send some portion of this to a referee to ascertain certain facts in regard to .the classification of these persons who are estopped. We will return here on Friday, April 13th, for the purpose of making up the decree.
There is some question about the apportionment of costs, and that question we will hold open until we return. There are several questions that will arise on the apportionment of' costs.